UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-20373-CR-RUIZ

UNITED STATES OF AMERICA

vs.

CHARLIE HOLLEY,

    Defendant.

_____/

## MR. HOLLEY'S SENTENCING MEMORANDUM & REQUEST FOR DOWNWARD DEPARTURE

    Charlie Holley, through undersigned counsel, respectfully submits this sentencing memorandum to aid in the Court's determination of an appropriate sentence. As explained below, Mr. Holley moves for a downward variance in this case and contends that a sentence of 161 months imprisonment (120 months for Count III, consecutive to 41 months for Counts 2, 4, and 5) fully satisfies the § 3553(a) factors in this case.

    **A. History and Characteristics of Mr. Holley**

    Mr. Holley is a forty-three year old black man who grew up in the projects of Florida City, Florida. When Mr. Holley was a newborn, his maternal grandfather "took" Mr. Holley away from his mother, likely due to her severe substance abuse problems. Mr. Holley's mother never made any efforts to be in her son's life. She was an alcoholic who moved to Georgia and ultimately abandoned Mr. Holley. As for Mr. Holley's father, he was absent for unknown reasons. At bottom, neither were present

1

in Mr. Holley's life. Mr. Holley's siblings were scattered apart and raised in various households. Fortunately, Mr. Holley's maternal grandmother—Marie Simmons— raised him as if he was her own child. Ms. Simmons gave Mr. Holley a place to live and the love he never received from his parents. While Ms. Simmons did the best she could to help raise Mr. Holley, their family was poor and struggled to make ends meet. Mr. Holley's maternal grandfather—Joe Simmons—passed away when Mr. Holley was just two years old. In response to his family's financial situation, Mr. Holley would leave school early to try and make money. When he was eleven years old, Mr. Holley would work in the fields planting and harvesting. When he was fourteen years old, Mr. Holley worked at a Mexican restaurant. Mr. Holley did his best to try to help his family put food on the table.

Given that Mr. Holley was focused on making an income at such an early age, it is perhaps unsurprising that he struggled in school. He had to repeat second, third, and seventh grade. He started using marijuana and drinking alcohol, and was frequently suspended for fighting. Notably, although Mr. Holley himself was never diagnosed with an intellectual disability, his brother and sister both received Supplemental Security Income for having an intellectual disability.

Growing up, Mr. Holley was interested in sports and played football for several years. No one showed up for his games, though, and he did not feel like he had the support of any of his family or friends. Ultimately, Mr. Holley dropped out of school in ninth grade without much of a plan for the future.

Although Mr. Holley's personal circumstances do not excuse his conduct, they do provide context to why he ended up before the Court in this case. He has not had an easy life, nor one with many opportunities for success.

**B. Nature and Circumstances of the Offense**

Aggravated assault, brandishing and discharging a firearm, and possessing a firearm and ammunition are undoubtedly serious offenses. The jury found that on June 21, 2021, Mr. Holley assaulted C.W.—the postal carrier—with a weapon and brandished and discharged a firearm that was unlawfully in his possession due to his status as a convicted felon. To be sure, these offenses are violent and dangerous.

But the seriousness of the crimes are mitigated by the severity of the mental health crisis Mr. Holley was undergoing in June 2021. As the Court is well aware, this case was in a holding pattern for several years because Mr. Holley was not initially competent to proceed to trial. (*See* DE 11, 24, 32). Although Mr. Holley was eventually found competent to proceed with this case, (DE 52), the findings from the competency evaluations reveal the state of Mr. Holley's mental health in June 2021.

Specifically, an April 14, 2022 evaluation by forensic psychologist Jeremiah Dwyer at the Federal Detention Center in Englewood, Colorado determined that there was "sufficient information/evidence to indicate that Mr. Holley may be suffering from a mental disorder that significantly impairs his present ability to understand the nature and circumstances of the court proceedings against him, and his ability to properly assist counsel in his defense." (Apr. 14, 2022, FDC Eval. at 19). Within the report, Dr. Dwyer noted how Mr. Holley stated "that during the four days

3

prior to his arrest, he began to experience significant physical discomfort due to what he believed were 'electrical currents' and 'microwaves' being emitted into his residence (and the surrounding area)." (*Id.* at 7–8). Mr. Holley further "reported these currents created uncomfortable physical sensations and sounds, and impaired his ability to engage in basic functions such as eating, drinking or using his phone." (*Id.* at 8). Mr. Holley "believed these beams were part [of] a control mechanism, and he voiced concerns that law enforcement was responsible." (*Id.* at 8).

As explained in Dr. Dwyer's report, Mr. Holley was paranoid that "law enforcement has had a history of attempting to sabotage him when he is employed, [and] functioning well in the community[.]" (*Id.* at 16). Mr. Holley believed that his mail was "being 'messed with,' which he ascribed to law enforcement attempting to monitor him, and possibly provoke him." (*Id.* at 16). Mr. Holley did not know who was supposedly tampering with his mail, but he reported that he would "go to the mail box, and there would be all these opened envelopes." (*Id.*).

On January 10 and June 1, 2023, Mr. Holley was evaluated for a second time by FDC medical staff, this time by forensic unit psychologist Nicole Osborn. (June 1, 2023, FDC Evaluation). Dr. Osborn found that Mr. Holley "reports consistent and significant mental health symptoms." (*Id.* at 20). During these 2023 evaluations, Dr. Osborn noted how Mr. Holley "asserted he felt that police were setting him up by delivering an illegal package and noted concern [that] the mail carrier was working with police to set him up." (*Id.* at 10). Mr. Holley "described feeling 'paranoid' at the time and unplugging all of his appliances because he felt 'microwave' electricity

4

running through the wall and his feet." (*Id.* at 10). Moreover, "[h]e elaborated he believed police were emitting microwave electricity into his home." (*Id.* at 10). In conclusion, Dr. Osborn found that "[o]verall, given the bizarre nature of Mr. Holley's alleged offense, the consistency of his reported beliefs, and his observed level of functioning, it appears most likely that Mr. Holley suffers from a Delusional Disorder." (*Id.* at 19). Amongst other findings, Dr. Osborn noted that Mr. Holley "reported he planned to take his case to trial solely because he want[ed] to know what [was] in the delivered package[.]" (*Id.* at 21).

The evidence introduced at trial showing pictures of Mr. Holley's residence on the day of the offenses align with his delusions at the time. Specifically, at trial, the government introduced pictures showing a broken microwave outside Mr. Holley's residence. Mr. Holley had thrown the microwave outside the window because he believed the electrical currents from the machine were manufactured by law enforcement to control him. Evidence at trial also showed that there was a portion of the wall next to the staircase inside the residence that had been torn out. Mr. Holley had torn through the wall because he believed he could feel the currents coming through it. In addition, during trial, Sheila Moss—who was located in the adjoining townhome—testified (according to counsel's recollection) that she could hear Mr. Holley loudly talking to himself through the walls.

In sum, on the date of the offense, Mr. Holley was in the peak of a psychotic, delusional episode. In his paranoia, he believed that Officer Joe Shiver—the first responding officer at the scene of the crime—had been following him and had been

5

unlawfully persecuting him for years (Mr. Shiver and Mr. Holley grew up together and went to the same high school). He was convinced that the postal carrier was trying to deliver something that could be used to control him. He did not want to hurt her, he just was not thinking clearly. Indeed, the jury's finding of not guilty as to the attempted murder charge proves that Mr. Holley was not trying to harm C.W. Without a doubt, the crimes for which Mr. Holley was found guilty are serious and violent, but Mr. Holley's limited mental capacity and severe delusional state on the date of the offenses mitigate his culpability and should be considered by this Court when fashioning a fair sentence.

### C. The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, and to protect the public

Given the serious nature of the jury's findings, Mr. Holley must be punished with a term of imprisonment. But there are several reasons why 161 months sufficiently punishes him based on the § 3553(a) factors. For starters, this Court should take into consideration the fact that in opening statements, Mr. Holley, through counsel, admitted to unlawfully possessing the firearm and ammunition. In fact, before trial defense counsel informed the government that Mr. Holley would plead to these charges. Because Mr. Holley accepted responsibility for Counts 4 and 5—possession of a firearm and ammunition by a convicted felon—this Court should downward depart from the guidelines.

As for Mr. Holley's criminal history, a criminal history category of III substantially over-represents the seriousness of his criminal history and is a reason

for a downward departure. *See* U.S.S.G. § 4A1.3(b)(1). U.S. Probation attributed a criminal history point for a withheld adjudication for the simple possession of marijuana (PSI ¶ 57) and two points for two convictions of driving while license suspended (PSI ¶¶ 54–55). These offenses added 3 total points to Mr. Holley's criminal history category and paint Mr. Holley to be a more serious offender than he actually is.

With respect to the criminal history point for simple possession of marijuana, Mr. Holley *was not even convicted* of the offense, his adjudication was withheld. (PSI ¶ 57). Moreover, this Court should also take into consideration the significant efforts by President Biden and the federal government to decriminalize these types of charges. Specifically, on October 6, 2022, President Biden delivered A Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana, which pardoned all offenders convicted of a federal offense of simple possession of marijuana. *See A Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana*, THE WHITE HOUSE (Oct. 6, 2022), available at: https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/. In addition, the U.S. Department of Justice recently submitted proposed legislation that would reschedule marijuana to a schedule III substance. *See Proposed Rule Seeks to Move Marijuana from Schedule I to Schedule III, Emphasizing its Currently Accepted Medical Use in Treatment in the United States*, U.S. DEP'T OF JUSTICE, OFFICE OF PUBLIC AFFAIRS (May 16, 2024), available at https://www.justice.gov/opa/pr/justice-department-

submits-proposed-regulation-reschedule-marijuana. Although Mr. Holley's charge of simple possession of marijuana was in state court, not federal, this Court should consider the current position of the federal government on marijuana when deciding whether a downward departure is warranted in this case.

Moreover, the Commentary to the U.S. Sentencing Guidelines specifically contemplates that a downward departure from a defendant's criminal history category may be warranted if "[t]he defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person." U.S.S.G. § 4A1.3, App. Not. 3(A)(ii). There is no evidence that Mr. Holley's possession was for anything other than personal use. (*See* PSI ¶ 57). Accordingly, Mr. Holley's withheld adjudication for simple possession of marijuana is a reason for this Court to downward depart.

Another reason Mr. Holley's criminal history is overrepresented is because U.S. Probation assessed him two criminal history points for driving with a suspended license. These were nonviolent traffic offenses that occurred two months apart from each other. (*See* PSI ¶¶ 54–55). Mr. Holley was sentenced on the same date for both charges to a concurrent term of sixty-days imprisonment. (*See id.*).

Of note, driver's license "suspension rates are highest in areas with larger propositions of people of color and low-income people." *See* Carson Whitelemons, *et al.*, *Driving on Empty: Florida's Counterproductive and Costly Driver's License Suspension Practices*, FINES & FEES JUSTICE CENTER (Oct. 2019), available at https://finesandfeesjusticecenter.org/content/uploads/2019/11/florida-fines-fees-

8

drivers-license-suspension-driving-on-empty.pdf. Significantly, "Black people have suspended driver's licenses on average 1.5 times the rate they are represented in the general population." *Id.* at 4, 10. Generally, "[i]t takes years for most people to regain their licenses once suspended – 75% of driver's licenses suspended in 2016 remained suspended two years later." *Id.* And, "[u]nlike the power to vote, the ability to drive is crucial to the debtor's ability to actually establish the economic self-sufficiency that is necessary to be able to pay the relevant debt" *See Robinson v. Purkey*, 326 F.R.D. 105, 156 (M.D. Tenn. 2018). With these statistics in mind, this Court should downward vary because driving is a necessity to daily living and offenses for driving while license suspended have a disparate impact.

In sum, this Court should downward vary in this case because without the three criminal history points for a withheld adjudication for simple possession of marijuana, and driving with a suspended license, Mr. Holley would have a criminal history category of II. In addition, if this Court were to give Mr. Holley 2 points for acceptance of responsibility, his base offense level would be a 21. A base level of 21 and criminal history category of II, results in a guidelines range of 41 to 51 months. Any such sentence would be on top of a consecutive term of 120 months imprisonment due to the mandatory minimum sentence for Count III, discharge of a firearm in furtherance of a crime of violence. To be clear, Mr. Holley does not object to Probation's calculation of the guidelines. Rather, he contends that the arguments articulated in this memorandum are reasons to downward vary in this case to 161 months total imprisonment.

9

### D. Deterrence

This case has deterred Mr. Holley from ever becoming involved in the criminal justice system again. The longest prison sentence Mr. Holley has ever received has been for three years for felon in possession of a firearm. (PSI ¶ 56). A sentence of 161 months is over ten years longer than the longest sentence he has ever previously served. Accordingly, a sentence of 161 months significantly punishes Mr. Holley for the crimes and will deter him from reoffending.

In addition, the most important person in Mr. Holley's life is his grandmother, Marie Simmons. She is the only person throughout his life who has shown him unconditional love. Ms. Simmons is currently in her 90s, has trouble walking, and is hard of hearing. Even if this Court were to sentence Mr. Holley to 161 months, it is unlikely Mr. Holley will ever see his grandmother again due to her advanced age and health. The fact Mr. Holley will not see his grandmother again is a significant punishment that has deterred him from ever putting himself in a situation that could cost him his liberty. Upon release, Mr. Holley wishes to reconnect with his children and become a productive member of society.

### E. Conclusion

For the foregoing reasons, Mr. Holley contends that a sentence of 162 months imprisonment (120 months for Count III, consecutive to 41 months for Counts 2, 4, and 5) fully satisfies the § 3553(a) factors and is the appropriate sentence in this case.

Respectfully submitted,

**HECTOR DOPICO**
**INTERIM FEDERAL PUBLIC DEFENDER**

By: /s/ *Alexandra A. Hoffman*
Alexandra A. Hoffman
Assistant Federal Public Defender
Florida Bar No.: 1011796
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 533-4180
E-mail: alexandra_hoffman@fd.org

By: /s/ *Christian Dunham*
Assistant Federal Public Defender
Florida Bar No.: 146587
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 533-4177
E-mail: christian_dunham@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on May 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Alexandra Hoffman*